The fifth case for argument is United States v. Javaar Watkins. Mr. Meyerson, I understand you've been appointed under the Criminal Justice Act in this case and the court appreciates your willingness to serve. You may proceed with your argument. Thank you, Your Honor. May it please the court, Madam Clerk, counsel, I am Paul Henry Meyerson of Bismarck, North Dakota, and I have the distinct honor of representing Appellant Mr. Javaar Watkins. As this court recalls from the filed briefs, Mr. Watkins was convicted of possession of a firearm by a prohibited person stemming from an early morning shooting after a bar fight in Bismarck, North Dakota. From the start, the prosecution of Mr. Watkins' case has been riddled with fundamental constitutional errors, from an improperly granted search warrant lacking probable cause because it was based upon the unverified word of a seven-year-old child, to an unduly suggestive photo lineup because it was a one-person photo array, to a trial where Mr. Watkins was not allowed his defense nor his properly requested jury instructions, all in addition to having to stand trial wherein his own brother, his own flesh and blood, presented an antagonistic defense. These fundamental constitutional errors demand reversal and remand for a new trial. The Fourth Amendment guarantees United States citizens the right to be free from unreasonable searches and seizures, and that search warrants be granted upon probable cause. Illinois v. Gates from the United States Supreme Court, Counselor, if I could direct you more specifically to facts here, didn't the district court say, because you said the seven-year-old in your opening, didn't the district court say even without the child's testimony, and it's a child of, was he seven, the child? Yes, Your Honor. He was a seven-year-old who said, Daddy's got a gun, twice, right? And didn't the district court say even without the child's testimony there was probable cause? And Your Honor, what wasn't clear from that order was whether or not the trial court was And it didn't strike me, Your Honor, as if the court was saying, well, let's just go ahead and ignore everything that the child said, that there was still probable cause here, because as we argued to the trial court, Your Honor, where was the nexus? This was a trailer home, far east Bismarck. The shooting was in the middle of Bismarck. Where was the nexus between the two on a two-week break from when this incident happened at the end of September to the middle of October? So it didn't strike me as the district court or the trial court being excludingly clear as to what it meant. But Illinois v. Gates is instructive, as it indicates. I don't mean to quarrel with you, but I want you to have a chance to reply what I just thought. On page 7, I think that middle paragraph, it's in, thank you for the good addendum with the order in it. I appreciate that. But it says, my daddy has a gun. And then the district court says, if you want to get it, it's page 7 of your addendum, I'm pretty sure. Yeah, it is. I'm right. Look at the paragraph. The defendant's challenge to search warrant specific statements by the seven-year-old. Courts find it contains that evidence we found, comma, regardless of XW's statements. I think that's talking about the gun. The gun's in the previous sentence. And that's all there is in that paragraph. Tell me if I don't understand it. I think what, and this goes to the issue of collaboration, Your Honor, and I do appreciate the question, because I think the case that we attached to our suppression motion filings, the US v. Negro case out of the Sixth Circuit, was instructive about the level of collaboration needed. Recall that there was no collaboration in this case of that child's statement as to veracity, reliability, and basis of knowledge, despite the officers having the ability to go ahead and ask other adults that were present during this time of interaction. The affidavit lists the scheme of the gun, it lists suspects in the shooting, and he was convicted felon. Is that enough without the seven-year-old's statements? Your Honor, I don't believe it is, because I believe there still has to be a showing of a nexus between this incident and somehow the home. That would be my position, Your Honor, is I don't believe it's there. The other thing that I think is instructive in all of this is the fact that, and it's on the record, it came up in the suppression hearing motion, that the trial court, the original state court that granted the suppression, or that granted the search warrant, did not even, it was paper only, it was within the four corners of this affidavit. There wasn't any further questioning by the state trial court to delve any further than what was beyond the record. I assume that's the way most are done in North Dakota, right, on the papers? These days, emailed around on iPads and all, right, aren't most done on what you call the papers, the iPads? Your Honor, if the court's asking me for my opinion or asking me if I know, I don't know. Okay, proceed. Go ahead. Your Honor, my point was, is that in regards to the child, the facts surrounding the child is that his, there was no collaboration about the child, and Illinois v. Gates is instructive in that reasonable and prudent people would not be relying on the uncooperated word of a seven-year-old child. The next issue where the next fundamental constitutional error relies from the unduly suggestive photo array. Let's assume that that was unduly suggestive. I understand your position is that there's just one person that even arguably meets the to choose. So let's assume that that is impermissibly suggestive. What about the other factors that we look to see whether the identification is reliable? This isn't sort of a one-time moment, a flash where the person only gets a moment to look at them, at the person. Why isn't there enough else in the record to convince the court that it was sufficiently reliable to allow the jury to hear it? Your Honor, thank you, and I do appreciate the question because it was not reliable. What you have on the record, Your Honor, and specifically the reports of Professor Cain and some of the testimony is the violations in protocol here that the police did is that this was not a blind administration. Detective Allerdings knew who the suspect was. Scientific research in psychology has shown that when that person, when the officer knows who it is, there are cues that suggest to the person. So is it your position that that impermissible process in the lineup tainted every other indicia of reliability that this witness could show in identifying who it was that had the gun or shot the gun? Yes, Your Honor. This is so intertwined, both with this photo lineup to what happened at trial. It is so intertwined. To further answer the question, we have law enforcement also never giving the important pre-identification instruction. On this, I believe the evidence in the record, Your Honor, is for the October 2nd lineup where J.J. did go ahead and select another suspect. There, the important pre-trial identification was the witness may or the suspect may or may not be in this lineup. That wasn't done on the October 8th photo lineup. And that, too, goes to the reliability of this whole issue. And then, as the courts recognized in its question and is shown essentially by Professor Cain's mock witness paradigm evaluation, the statistics are startling. The photo lineups, the fillers, were not doing their job. The ratio in the black and white was 1.29. This was a one-person lineup. Counsel, going to Judge Kelly's question, does the record reflect how long the Bard Bucks first incident, I think the place is called Bard Bucks, right, where the first incident occurred? How long did that, how long were they together there? Your Honor. Does the record show how long they were together, the first part of the deal? The record, as for a specific time minute, I don't believe it does. Does it imply it was a long time or a short time? I think it implies it, Your Honor, and I do appreciate the question because I think it implies it because there, I would say medium, Your Honor, because, because, because, because there was, there's talking about interactions of, you know, trying to pick up a lady for the evening, then there was a talk of a fight, so I'm not going to say it's short, I'm not going to say it's long, Your Honor. Okay, I get that. Now, the, the, during the shooting incident itself, does it reflect how long that was, the record? No, Your Honor. Because it didn't happen immediately, the shooting, as you know. It wasn't the first day, it wasn't a walk-up, drive-up, walk-up shooting. No, Your Honor, the, the record doesn't say, got it down to this, this many minutes. Can you tell how many minutes it was, long or short? Again, Your Honor, you can go to the record and there's, again, I would classify it as short. I would say it all happens within a, a, a very quick time. Okay, thank you. And I, if, if you have more you want to say on that, I, you're, it's fine if you do, but I do want you to address, if you might, the irreconcilable defenses issue. I'm, the, you motion, you filed, or you moved for a severance several times, both at the beginning of the trial and throughout the trial, and I'm trying to understand how these defenses are irreconcilable, and kind of just getting to the point, it seems like there's either one of the defendants in this case, either possessed, aided and abetted the possession of, or constructively possessed, so you've got the time of the shooting, which has possession and aiding and abetting, and then you've got the construction possession option back at the home. Where do these, where, where did the defenses so collide here between the brothers that you say a severance was required? Help me understand that. Your Honor, I, I appreciate the question, I'll answer it two ways. One, the trial court ignored what was right in front of their face, the laws of nature, that these two were brothers, specifically when it, when the trial court talked about this court's precedent, it stayed away from the fact of recognizing that this was family. The law of nature is that blood is thicker than water, and, and this jury didn't see it. That's being antagonistic. The second time... And I'm sorry, I don't, I'm not sure I understand that aspect of the irreconcilable difference that they're brothers. Your Honor, I guess, in, in my opinion, blood is thicker than water. We're in this together, and we go with the same defense, but they diverged, is where, is where I'm coming from. Oh, because they're brothers, they, they, their instinct was to go with a joint defense, and then that broke down. Exactly. The other point, Your Honor, in the first day, there was talk on the record about the altercation, the, the meeting that we had in chambers over the noon hour about essentially the, the altercation between the brothers in the holding cell, and I believe even the court mentioned the court wanted us to sit at different council table or move apart or something like that. It was that, then, Your Honor, that I think that was more than enough for the trial court to say, because it did say, the jury's, the jury's picking up on this, or the jury will pick up on this, and I think that that's more than enough to go ahead and make for an antagonistic defense. I'll leave the remainder of my time for rebuttal. Thank you. Very well. Thank you for your argument. Mr. Volk, we'll hear from you. Good morning, and may it please the court and counsel. I want to bring something up that's in the record that I think sort of, well, it doesn't cause the court not to have to decide any of the issues that are before it. I think it changes the priority or, of those specific issues, and that's the sentencing hearing in this case. At sentencing, before sentencing, Mr. Myerson filed a sentencing memorandum supplement where he specifically said, there's not going to be an appeal, and Mr. Watkins is foreclosing that valuable right because he's going to accept responsibility. In fact, he attached a handwritten letter from Mr. Watkins where he admitted that he possessed the gun, that he was at this crime scene, and then he participated in the shooting, and we went to this. The jury didn't rely on that, though, right? No, no. Clearly not, Your Honor. So is that before this court in any way? Tell me. It's in the record. The reason I bring it up. This is an appeal of a judgment? Tell me. I'm not the criminal expert here, but tell me. Tell me. I'm missing it. So here's the reason why that is sort of important, and as I said, it just identifies the priority of the issues here because the real issue that's going to result, regardless of what this court does, if you reverse and remand for a new trial, the only issue that really is of any importance becomes the search warrant issue because that's where the guns were found, the search warrant issue itself. The identity issue is not going to be an issue whatsoever on a retrial at all, whether it's the expert witness or the photo identification or, quite honestly, the jury instruction issue. None of that will become important because Mr. Watkins has practically admitted it. And you didn't brief this issue, did you, counsel? I don't mean to beat you up, but it's a surprise to me, and I'm not— Say that again. It's not because Watkins, what? You were about to say— I'm sorry. Mr. Watkins acknowledged he possessed the firearm, and he was there at the crime scene that he committed the shooting itself. So he acknowledged all that at the sentencing hearing. It's all part of the record. Again, it doesn't change that the court needs to decide the issues that are before it, but it prioritizes them, in my opinion. And so that's why I wanted to start— What was the context in which he acknowledged it?  He explained how he did it. What context? He told the court— In what context? Was he called as a witness?  So the judge— Was he giving an allocution? What was happening? He was giving his allocution. That's correct. And before the judge sentenced him, he was allowed— He has an ineffective assistance claim for not being advised to keep quiet during allocution until the appeal is resolved? It was solely his decision, Your Honor, and Mr. Watkins made that clear on the record that it was his decision to do this. Is he sworn in allocution? I said I'm not the criminal law expert here. Was he sworn? Was he under oath on the allocution? I don't believe he was, Your Honor, but again— But you're saying you would try to use it against him in a retrial. Yes, Your Honor. And there's a submitted written statement from him that's attached as well. And I don't want to belabor the point. I just want to bring it up. Yeah, you've done it for most of your argument. So the reason I brought it up is because I think the search warrant issue is the most important, and quite honestly, I think it's the weakest for Mr. Watkins in this case. And here's why. He ignores much of what's in the record. The court's already asked him about some of that. Well, one of the things you haven't asked him about yet is a finding by the district court that there was good faith reliance by the officers on this warrant. Mr. Watkins doesn't even mention the words good faith in either of his briefs to this court. So he should lose on that basis alone. He doesn't challenge the district court's finding of good faith, and there's nothing in the record that would dispute it. The only thing that comes somewhat close to even discussing it is his allegation of misrepresentation. But that misrepresentation was never to the—was never an allegation that there was a misrepresentation to the magistrate judge in this case. It was a misrepresentation that he claimed was made to Amy Wolfe, who was the homeowner in this case, and quite honestly, that misrepresentation never has any legs. The alleged misrepresentation— It did occur. No. I disagree that it occurred. The officers told Ms. Wolfe, when she asked, will I get in trouble if there's any drugs in the house? And they said to her, well, only if—paraphrasing—only if you're the biggest drug dealer, right? Not concerned about small amounts of marijuana. That's the misrepresentation. Now, it was included in the affidavit that there was marijuana. The district judge never relied on that in finding probable cause. We offered that as a possible reason to do so in our brief to the district court. The district court judge never relied on that. So here's the reason why it was not a misrepresentation to her. She didn't get in trouble. So there's no legs to stand on. And secondarily, and most importantly here, there wasn't a misrepresentation that was ever made to the magistrate judge. And that's how good faith could possibly be denied by the district judge. And so that's never addressed. Also never addressed, effectively the argument made to this court is identical to what was made to the district court judge. It's almost copy and paste of the motion that was made, arguing this warrant was based upon the uncorroborated statement of a child. That's not how this started and that's not how the affidavit reads. It's as if Mr. Watkins ignores everything else that's in that affidavit. He doesn't even address it. Those other things are why they were standing there at the door of Mr. Watkins' home because of all the other information that was in there. And then they presented the fact to the magistrate judge that both of these individuals, G. Anthony and Javar, had been removed from the home. They didn't have a firearm on them. Mr. Myerton argued, well, there was no nexus. But this court has specifically said in other cases that courts can rely upon the fact that individuals generally keep firearms at their home and they keep them for a long period of time. And the judge here did so. And he referenced that. And that's never been challenged. So again, that's the weakest argument that I think that he has because he misses much of the record. The other issue that would yet come up potentially is the instruction issue. The eyewitness instruction, eyewitness testimony instruction. The argument is he wanted a specific instruction. Mr. Watkins wanted a specific instruction from the district court. But he never argues that the instruction actually given by the district court was wrong. That it didn't state the law correctly. Or even that it didn't accurately provide him the opportunity to present the defense that he wanted. I've always thought that hesitate to rely on important matters language was beneficial to the defendant. But this is the first case I've seen it argued that it's not optimal for the defendant. I personally haven't. The important matters idea was to make the jury think it's whether you would hesitate, not in just a routine everyday matter, but in a matter of great significance. I haven't seen it brought up either. I did notice that Mr. Watkins didn't cite any specific case in his argument with respect to the reasonable doubt. Well, he generally cites the Supreme Court statute that says, you know, the court has to correctly state the law. But he doesn't cite anything that specifically says that particular language is problematic one way or the other. So there's really nothing that he's relying on other than his own subjective opinion as to that. And his argument is, well, the United States Supreme Court has looked very carefully at those phrases, all those phrases in his brief. So go ahead. Yeah. His argument is, well, this has dropped it to some form of subjective standard. When you look at the actual language that's used, it talks about a reasonable person, which is not a subjective standard. Which instruction are you focusing on? The reasonable doubt instruction. Yeah. There was another issue on the eyewitness. Yes. And that's what I was saying about the eyewitness instruction is simply that he's not arguing what the court, he fails to argue what the district court gave was incorrect, that it was a wrong instruction. He wanted, I believe, an instruction from the Northern District of Iowa or from New Jersey primarily. And a defendant isn't entitled to any specific instruction. Some judge may give it and some judge may not. What he has to argue to succeed. Well, he could be read to be arguing that it's incorrect insofar as it didn't include all this additional material that New Jersey uses. And that made it insufficient. Well, I think that's more he wants to put forth facts and opinions that are included in that New Jersey instruction that were never before the court, one way or the other. He's not entitled to a specifically worded instruction. And this is an Eighth Circuit pattern instruction that was used. And I don't believe that there's any even inference from what he's arguing that indicates that was incorrect here. You just have a few minutes left. And I'd like to ask you about the severance issue that came up pretty quickly after opening statements. Yes. And is it, it sort of seemed that given the openings, kind of the, almost the theory of the government's case shifted a little bit, at least as to the co-defendant brother, that sort of there's no longer a, by that time there's no longer sort of, I'll call it the phantom third gun. There's no longer the possibility or this idea that there was another gun. Is that how you saw it? That there was sort of a shift in the government's theory at that point on at least the co-defendants, T. Anthony's liability in this, responsibility. No, we didn't, our theory of the case never changed. Did it change as to this third gun, possibility of a third gun? No. I don't believe so. We presented to the jury testimony from K.J. that while he was outside, both of the defendants appeared and both had firearms. So that never changed. Really the antagonistic claim that's being made here isn't one that goes to the core of any defense. The core has to be, did he possess a firearm? Not whether he was present, whether he did the shooting. It has to be whether or not he possessed a firearm. This court has said multiple times over that it's not a sufficient antagonistic defense for one defendant to take a position that he was present, but had nothing to do with crime, and another who is arguing I wasn't there at all. This court has done that multiple times over. So I'm not sure how Mr. Watkins' argument reasonably challenges any of those holdings by this court itself, because he never really asserts anything beyond that. That's simply what he's saying. Well, did the brother's defense posit that both of the brothers were present? And is that the supposed inconsistency or irreconcilability? Well, I think, yes, I think that's the claim, is that the one brother was saying I was there, my brother was there. No, he didn't testify, but that was sort of the claim that was made through the cross-examination of the other witnesses, that they were both present, but that T. Anthony didn't have anything to do with it. The other brother. Yes. The acquitted brother. The acquitted brother, correct. In other words, it was all this defendant's doing. Correct. Whereas this defendant's defense was I wasn't present at all. I wasn't present. And that's just at the shooting we're talking about. Not at the house, because he couldn't. They were both removed from the house or came out of the house. Where the firearms were actually found. There was certainly no misidentification at that point as to anybody or anything that was going on. I see my time is up at this point, Your Honor. Thank you. Very well. Thank you for your argument. We'll hear a brief rebuttal, Mr. Meyerson. Yes, thank you, Your Honor. I'll touch briefly on the jury instructions, specifically the proof beyond reasonable doubt. Our argument essentially is that phrase, life's most important decisions, life's most important decisions, job, marriage, have a child, are riddled, absolutely riddled with reasonable doubt. And that instruction lowers it to go ahead and bring it in to be entirely subjective. I would ask the court. Say that again? I didn't. I was having trouble understanding this argument. You're objecting to the language about important decisions. You wanted to just say hesitate to act, period? Essentially, yes. And how does that help the defendant? Your Honor, the argument is that when you. Judge Viator used to always give the. The government would complain that Judge Viator always gave that important decisions part because they thought it was more helpful to the defense. I shouldn't say the government always complained, but I always thought that that was the reason for it was to say, you know, you need to hesitate. If you would hesitate in a weighty decision, then you should find reasonable doubt. And therefore, don't look at this as just an everyday thing that you do day to day. Look at this as one of the really important things in your life. And if it's something of that magnitude and you would hesitate, then there's reasonable doubt. Isn't that better for the defendant than leaving the language out? I'm just not tracking your objection. Your Honor, our argument is that it essentially lowers the burden because it allows jurors to go ahead and think of their life's important decisions that even when they made the decision, those decisions still had logical, reasonable doubt as to whether it was the correct decision. What I would ask this court to do is to turn to two United States Supreme Court cases. I did not cite them in my brief. I can certainly submit something. Okay, why don't you send us a letter with the citations and we'll take a look. Thank you very much. Thank you so much. The case is submitted and the court will file a decision in due course. Thank you. That concludes the session for this morning. The court will be in recess until 9 o'clock tomorrow.